IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**GERALD W. BROCKINGTON**　　　　　　　　　　　　　　　　　　　**PLAINTIFF**

v.　　　　　　　　　　　　　　　　　　　**CIVIL ACTION NO.1:03cv168-LG-RHW**

**JO ANNE B. BARNHART,**　　　　　　　　　　　　　　　　　　　**DEFENDANT**
**Commissioner of Social Security**

## MEMORANDUM OPINION AND ORDER

Gerald Brockington ["Brockington"] appeals to the District Court from a final decision of the Commissioner of Social Security [the "Commissioner"]. The Commissioner found that as of April 1998, Brockington was no longer disabled under the Social Security Act and terminated the disability insurance benefits he had received for a period of disability beginning March 14, 1994. For the reasons set forth below, the Commissioner's decision should be affirmed.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Gerald Brockington has a GED and one or two semesters of college, and worked primarily as a shipfitter. Tr. 133. He was so employed at Ingalls when he was injured on March 14, 1994, at the age of forty. Tr. 68, 71. He has neither worked nor looked for work since that date. Tr. 72, 74. During the several months following his injury, he underwent both lumbar and cervical disk surgeries, and was found to be completely disabled, even from sedentary work. In a decision rendered April 26, 1996, the Administrative Law Judge (ALJ) found Brockington disabled based upon his severe impairments of "status post lumbar discectomy with herniated nucleus pulposus, and adjustment disorder/depressive anxiety

symptoms." Tr. 360-368. The ALJ recommended review of the matter in a year to determine whether Brockington continued to be disabled under the Act. Tr. 368.

Brockington received disability insurance benefits from March 14, 1994. until June 1998. A May 1998 review led to a determination that, as of April 30, 1998, he was no longer disabled under the Act. Tr. 369. By letter dated May 6, 1998, Brockington was notified that he would receive no further disability checks after June 1998. Tr. 369. Brockington requested a hearing, which was originally set for May 14, 1999. When asked if he would like to postpone the hearing so he could talk to someone about representing him, Brockington answered negatively, and was found to have waived representation. Tr. 50-53. However, the ALJ suggested that he consult with somebody about representation,[1] offered him a list of names, and continued the hearing. Tr. 55-56. When the case came on for hearing October 21, 1999, Brockington again appeared without representation, and stated he just wanted to get it over with. Tr. 62-63. He was again found to have waived representation and the hearing went forward, with the ALJ taking testimony from Brockington and vocational expert Kelly Hutchins. Tr. 64.

Brockington testified he was born December 30, 1953. At the time of the hearing, he and the older of his two children lived with Brockington's mother in her mobile home in Bay St. Louis. He has a valid driver's license, but drives only short distances.[2] His nephew drove

---

[1] The ALJ explained to Brockington that there are people who represent Social Security claimants, and that he did not have to pay up front for anyone to represent him.

[2] The grocery store is within 1/2 mile of his home and he lives across the street from the hospital and two doctors.

2

him to the hearing. As previously stated, he has a GED and two semesters of college[3]. His primary work has been as a shipfitter, and he has no other vocational or special training. He testified he hardly worked at all until 1987; that he used to drink a lot.[4] The only job he held for more than a year was at Ingalls, where he worked 2 1/2 years until he got hurt on March 14, 1994. Before that, he worked as a pipe fitter on "turnaround jobs" - jobs of short duration, long hours and high pay. Tr. 67-73. Brockington does not receive food stamps, but does receive $512.00 per month in Social Security disability and $200.00 per month in child support. The child who lives with him gets $500.00 in SSI benefits. Brockington home-schools[5] this 12-year-old son because he has "explosive personality disorder." Tr. 74

    Brockington stated that he believes he is unable to work because of chronic pain and the medications he takes for it. He testified he has severe headaches, his back hurts every morning, and he has chronic depression, and he takes a lot of medication for these conditions.

    According to Brockington, Dr. Kergosien is his main doctor. He also sees Dr. Laseter and Dr. Roberts for pain management, and they want to put a morphine pump in him. He does not want the pump because he does not want to "walk around constipated all the time." Tr. 80-82. His therapist is Jerry Strickland, and his psychologist is Dr. Penton. He stated he spends much time on the phone with his psychologist David Penton, because Penton is in Gautier and Brockington lives in Bay St. Louis. Tr. 75-79

    Brockington was last seen by Dr. Kergosien a few weeks before the hearing, for

---

[3] He testified he wanted to be a substance abuse counselor

[4] Brockington testified he quit drinking May 3, 1987, went to AA for a while but then quit.

[5] He sits the child down in front of a video game and makes him try to sound out words to read the instructions. R. 97.

chronic earaches.  He was hospitalized in the spring of 1998 for a heart catheter.  Brockington testified he presently takes more medications than in the past, three for depression and anxiety, and others for pain in his back and head and associated nausea.  The medication gives him between moderate to complete relief, but he thinks his pain has become worse over time.  Tr. 83-84.  He sometimes wears a back brace and uses a TENS unit, especially in wet or cold weather.  Tr. 84.

With respect to activity, Brockington testified he watches TV an average of five hours a day.  He does no exercise.  He has been trying to write as a hobby, but has problems with carpal tunnel syndrome in his hand.  He bathes and dresses himself and visits his brother about twice a week.  He goes to bed at eight or nine, but does not fall asleep until three or four in the morning; he has medication to help him sleep.  He never sweeps, vacuums, mops or does much housework.  His mother takes out the trash and does the cooking; he can chop some vegetables,  but then has to sit down.  He goes to buy groceries but only a little at a time.  Tr. 86-87.  Brockington testified he can stand only a few minutes at a time, could probably walk one block before having to sit down and rest, and that he cannot bend from the waist, although he probably could get down on his knees and back up.  He can sit 15-20 minutes comfortably, and can carry two six-packs of diet cola into the house, but it bothers him going up the steps.  He estimates he could pick up and carry twenty pounds comfortably, and push or pull doors, but could not reach overhead and would "rather not" climb stairs.  His grip is adequate and he can pick up things without problem.   He has no training with computers other than what he has taught himself.  Tr. 87-93.

Vocational expert Kelly Hutchins testified Brockington's past work as a shipfitter is

4

classified a heavy job with a skill level of 8, and that Brockington cannot return to that work with limitations requiring a sit/stand option, precluding climbing, crouching, kneeling and crawling, and allowing only limited walking, balancing and stooping. Assuming he can do a full range of light work with these limitations, Hutchins opined that Brockington could perform work as a silverware wrapper,[6] a bench assembler[7] or ticket taker,[8] all of which are deemed light work and have a low skill level. Hutchins further testified that Brockington can also perform sedentary jobs such as taxi dispatcher[9] and food cashier[10]. Hutchins' opinion as to Brockington's ability to do these jobs did not change when he was asked to additionally assume that Brockington is on medication which has a moderate effect on his ability to remember or carry out complex instructions and detailed non-complex job instructions. Tr. 100-102. Assuming in addition to all the above, that Brockington has headaches which have a marked effect or limitation on his ability to do daily routine repetitive tasks, Hutchins concluded Brockington would be unable to perform either his past work or the above jobs. Tr. 103.

In early 1998, Brockington underwent both physical and psychological consultative examinations. On February 2, 1998, Dr. J.D. Matherne conducted the psychological exam. His diagnostic impression was that Brockington had a pain disorder associated with both

---

[6] Hutchins testified there are 425 such jobs in Mississippi, and 77,600 nationally.

[7] Hutchins testified there are 330 such jobs in Mississippi and 21,600 nationally.

[8] Hutchins testified there are 800 such jobs in Mississippi and 70,000 nationally.

[9] There are 100 such jobs in Mississippi and 10,000 nationally.

[10] There are 1,000 such jobs in Mississippi and 100,000 nationally.

psychological factors and his general medical condition, anxiety disorder, depressive disorder and nicotine dependence. Dr. Matherne further found Brockington to have mixed personality disorder, hypertension by history, cervical and lumbar pains secondary to apparent trauma by history. He concluded that Brockington appeared "somewhat impaired in his ability to perform routine, repetitive tasks" and "somewhat impaired in his ability to interact with co-workers and supervisors, primarily related to pain symptomatology." Tr. 26, 467-473. Dr. James Crittenden conducted the physical examination on March 24, 1998, noting that Brockington was alert, cooperative, and oriented times four, as well as well-developed, well nourished, and in no acute distress. He had 20/20 vision, full range of motion in his neck and no increased thyroid. Dr. Crittenden found that Brockington had full range of motion in his cervical spine, and motion in all his joints and back were normal, as was the strength in his hands, arms, shoulder girdle, pelvic and lower extremities. Brockington's chest and heart were normal, but his lungs revealed some diminished breath sounds in the left base. His neurological exam was normal, and although he used a walking cane, Dr. Crittenden noted he did not need it. Dr. Crittenden reported these impressions: (1) lumbar lamiectomy, (2) cervical fusion due to herniated disc, (3) headaches felt to be due to the cervical fusion, (4) chest pain probably of noncardiac origin, (5) history of chronic pain, and (6) chronic depression. Dr. Crittenden stated Brockington did not appear depressed on the day of examination. Tr. 26, 478-487.

    Medical records showed Brockington was hospitalized from April 3-15, 1998, for bilateral endoscopic anterior and posterior ethmoidectomy, bilateral endoscopic maxillary sinus antrostomy bilateral endoscopic spenoidotomy and septoplasty (sinus-related surgeries). Tr. 525-529. Dr. Christopher Lew noted that as of April 8, 1998, Brockington was being treated

primarily for back pain, headaches and neck pain.  His diagnosis was post-cervical fusion pain, post lumbar laminectomy pain, dental abscess and psychological factors affecting his physical condition.  Tr. 26, 506-524.  Dr. David Penton, clinical psychologist, noted on June 23, 1998, that he had been treating Brockington for four years, and was then seeing him twice a week and expected Brockington would need long-term, possibly lifelong, counseling.  His prognosis was fair to poor.  R. 26-27, 530-537, 594-596.  On June 25, 1998, Dr. Deborah Gross noted Brockington had major depression, but her prognosis was fair as he was showing slow improvement.

On November 18, 1998, Dr. Charles Kergosien noted he had been treating Brockington for four years for cervical disc disease, chronic pain, headaches and depression, and that treatment included anxiolytics, antidepressants, and rarely muscle relaxants and narcotics.  Tr. 27, 540.  Dr. Kergosien submitted letters and medical records May 11, 1999, and November 5, 1999, stating his belief that Brockington met the criteria for full disability because of his chronic neck and back pain along with chronic, tension-type headaches due to chronic sinusitis, cervical disc disease, osteoarthritis, hypertension, chronic pain syndrome, chronic obstructive pulmonary disease, and major depression. R. 27-28, 553, 556-81, 607.

Dr. Michael Finn's letter of April 11, 1999, stated Brockington had been under his care for multiple medical problems including chronic back pain exacerbated by climbing, lifting, standing, and walking, and coronary artery disease.[11]   Dr. Finn felt that "physical and emotional stress can exacerbate especially his orthopedic problems."  Tr. 27, 552. On January

---

[11]Dr. Finn stated his last angiogram showed about a 50% LAD lesion but his circumflex and right coronaries were normal.

7

26, 1995, Brockington saw Dr. Finn for a myocardial perfusion scan which suggested a mild degree of reversible ischemia in the inferior wall of the left ventricle. A chest x-ray revealed a "normal appearing chest" even though Brockington complained of chest pain. On May 25, 1995, Dr. Finn observed that Brockington was doing "relatively well." On March 4, 1998, Dr. Finn stated that Brockington was doing well. A stress test on April 1, 1998, noted "overall stress test electrocardiographically does not demonstrate changes suggesting ischemia." No chest pain occurred during the test, and ejection fraction of left ventricle was 80% post stress test. Tr. 27, 582-88.

An April 19, 1999, letter from Jerry Strickland, LMSW, who had seen Brockington for three years for anxiety and depression, stated , "due to [Brockington's] psychiatric difficulties and severe pain in his neck and back, due to injuries, it is my belief that he would suffer consequences if forced to work in an office environment." Tr. 27, 551.

From December 8, 1998, until February 9, 1999, Dr. J.T. Laseter treated Brockington for post laminectomy syndrome, cervical and lumbar and a "recent onset" of headaches. On February 2, 1999, Dr. Laseter noted that the medications have "helped quite a bit with his neck and back pain, but he is occasionally having headaches." Tr. 27, 589-92. Dr. John Roberts observed on May 8, 1999, that Brockington had a normal MRI and MRA, and that he rated his pain as a 7 on a scale of 10. His vital signs were all within normal limits, and he had no tenderness over the frontal or maxillary sinuses. His heart rate and rhythm were regular without murmur, and his lungs were clear to auscultation. Dr. Roberts' assessment was post-laminectomy syndrome, cervical and lumbar, and contracture type headaches, likely secondary to facet dysfunction and myofascial pain in the cervical spine. Tr. 28, 593.

On February 27, 1999, Dr. James M. Houber performed an EMG/Nerve Conduction study on Brockington, noting that he had "right carpal tunnel syndrome, moderately severe." Tr. 28, 606.  On October 25, 1999, Dr. Ted Willis stated that Brockington had seen him on numerous occasions for sinusitis and otalgia, and allergic rhinitis. Tr.  28, 607.

An eight-step sequential evaluation process applies in evaluating a beneficiary's continued entitlement to disability benefits.[12]   If sufficient evidence at any step of this process shows that a beneficiary still cannot engage in substantial gainful activity, the review process ceases and

---

[12](1) Is beneficiary engaging in substantial gainful activity? (2) If not, the Commissioner determines whether he has an impairment or combination of impairments that meets or equals the severity of an impairment listed in Appendix 1 of Subpart P of Regulations No. 4.  (3) If beneficiary has no impairment or combination of impairments that meets or equals a listed impairment, Commissioner determines whether there has been any medical improvement as shown by a decrease in medical severity.  If there has been no decrease in medical severity, the Commissioner proceeds to Step Five. 20 C.F.R. § 404.1594(f)(3)  (2000). (4) If there has been medical improvement, Commissioner determines whether it is related to the beneficiary's ability to do work; i.e., whether there has been an increase in the residual functional capacity based upon the impairment or impairments that were present at the time of the most recent favorable medical determination. If medical improvement is not related to the ability to do work, the Commissioner proceeds to Step Five. If medical improvement is related to the beneficiary's ability to do work, the Commissioner proceeds to Step Six. 20 C.F.R. § 404.1594 (f)(4) (2000). (5) If the Commissioner found at Step Three that there has been no medical improvement or if the Commissioner found at Step Four that the medical improvement is not related to the ability to work, the Commissioner considers whether any of the exceptions to the medical improvement standard apply.  (6)  If medical improvement is shown to be related to the beneficiary's ability to work (or if one of the exceptions to medical improvement set forth in 20 C.F.R. § 404.1594(d) applies), the Commissioner determines whether all of the beneficiary's current impairments in combination are severe.  If the beneficiary has a severe impairment, the Commissioner proceeds to Step Seven. If the beneficiary does not have a severe impairment, he will be found no longer disabled.  20 C.F.R. § 404.1594(f)(6) (2000).  (7) If beneficiary's impairments are severe, the Commissioner assesses his residual functional capacity and, based on all of his current impairments, considers whether the beneficiary can still do work that he did in the past. If the beneficiary can still do such work, his disability will be found to have ended.  20 C.F.R. § 404.1594-(f)(7)(b)(5)(vii) (2000). Otherwise, the Commissioner proceeds to Step Eight.  (8)  If  beneficiary is unable to do past work, the Commissioner considers whether he can do other work, given his residual functional capacity, age, education and past work experience. If beneficiary can do such other work, his disability will be found to have ended.  If the beneficiary cannot, disability will be continued.  20 C.F.R. § 404.1594(f)(8) (2000).

benefits are continued. 20 C.F.R. § 404.1594(f)(2000).  Applying this process to the evidence in this case, the ALJ found (1) Brockington had engaged in no substantial activity; (2) Brockington's current impairments consist of depression, hypertension, tension type headaches, chronic sinusitis, status post cervical laminectomy syndrome, status post lumbar laminectomy syndrome with degenerative disc disease, chronic back and neck pain, right carpal tunnel syndrome, and possible pulmonary disease.  "Giving the claimant the benefit of the doubt," the ALJ found all these impairments severe with the exception of carpal tunnel syndrome, which is not being treated, and the possible pulmonary disease, which had not yet been shown to be a severe limitation on Brockington's ability to perform basic work-related functions.  The ALJ further found that (3) and (4) Brockington's severe impairments neither individually, nor combined, met or medically equaled the severity of an impairment listed in Appendix 1, Subpart P of the regulations.  The objective medical evidence establishes his condition has sustained medical improvement to the extent that he can perform basic work-related activities on a sustained basis.  Next the ALJ found the fifth step inapplicable in light of the foregoing findings.  Finally, the ALJ found that, while Brockington's current impairments are severe and he cannot return to work as a shipfitter, he has the residual functional capacity to perform a limited range of light work within the  physical and mental limitations placed upon him by his condition.  Tr. 30.

    Dr. Crittenden's physical examination revealed that Brockington had normal range of motion in all his joints in his upper extremities, good range of motion in his cervical spine and neck and in his lumbar spine, and good ability to bend over, squat and recover.  His gait was normal, straight leg raising was negative and he was able to get up from a supine position or

rise from a chair without difficulty. Dr. Roberts' physical findings were essentially the same. Dr. J. D. Matherne, psychologist, found Brockington "somewhat impaired" in ability to perform routine tasks and to interact with co-workers and supervisors "primarily related to pain symptomatology." Dr. Penton's assessment in June, 1998, was that Brockington was capable of sedentary daily activities, exercising self-help skills, managing his finances, following simple instructions. Dr. Gross noted his prognosis for major depression was fair, that he was showing improvement as of June 1998.

      The ALJ concluded that Brockington could lift/carry a maximum of twenty pounds on occasion and up to ten pounds frequently, needed a sit/stand option and no climbing. He further found that Brockington's abilities were limited to routine repetitive tasks, and that he was moderately limited in ability to interact with co-workers and supervisors and in maintaining concentration/attention. Within these limitations, and consistent with the expert vocational testimony, the ALJ found Brockington capable of a limited range of light work, including silverware wrapper, bench assembler, ticket taker, taxi dispatcher and booth cashier. On September 29, 2000, the ALJ issued his decision finding Brockington was no longer disabled within the meaning of the Social Security Act. Tr. 24.

      Brockington submitted additional medical evidence to the Appeals Council in connection with his request for review, consisting of medical assessments from Dr. Kergosien and Dr. Laseter. Tr. 613-614, 615-616. Each of these assessments indicated that Brockington did not have the capacity to do any sort of work on a full-time basis. After considering this additional evidence, the Appeals Council denied review on November 26, 2002. Tr. 8.

## THE STANDARD OF REVIEW

"Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action" in a district court.  42 U.S.C. § 405 (g).  Judicial review of a final decision of the Commissioner is limited to determining whether substantial record evidence supports the Commissioner's factual findings, and whether such findings are reached through the application of correct legal standards.  *Falco v. Shalala*, 27 F. 3d 160, 162 (5th Cir. 1994). "Substantial evidence is ... such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla, but less than a preponderance.  *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001); *Villa v. Sullivan*, 895 F. 2d 1019, 1022 (5th Cir. 1990.  The Fifth Circuit has further stated substantial evidence:

> must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'

*Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

In applying this standard, the Court reviews the entire record to determine whether substantial evidence supports the Commissioner's decision.  *Villa*, 895 F. 2d at 1022. Credibility of witnesses[13] and conflicts in the evidence are issues for resolution by the Commissioner, not the Court.  The Court may neither substitute its judgment for that of the

---

[13] The ALJ found Brockington's assertions regarding his limitations "not totally credible..."  Tr. 32.

12

Commissioner nor re-weigh the record evidence. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000) (quoting *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995) and citing *Johnson v. Bowen*, 864 F. 2d 340, 343-44 (5th Cir. 1988)) (footnotes and quotation marks omitted); *Selders v. Sullivan*, 914 F. 2d 614, 617 (5th Cir. 1990). Factual findings supported by substantial record evidence are conclusive and must be upheld. *Estate of Morris v. Shalala*, 207 F. 3d 744, 7445 (5th Cir. 2000). Although the Court may reverse the Commissioner's decision if it is based upon faulty legal analysis, the Court should accept the Commissioner's legal conclusions if they are within reasonable meanings of the statutory or regulatory language. *Chevron, U.S.A., Inc. V. Natural Resources Defense Council*, 467 U.S. 837, 841-44 (1984). In the absence of a finding that the Commissioner applied an incorrect legal standard, or that the decision is unsupported by substantial evidence, the Court must affirm the Commissioner's determination. *Boyd*, 239 F.3d at 704.

The substantial evidence standard of review applies to cessation of benefits cases. The Social Security Disability Benefits Reform Act of 1984, Pub. L. No. 98-460, 98 Stat. 1794 (1984) (Reform Act), amended Section 223(f) of the Social Security Act, in relevant part, as follows:

> A recipient of benefits under this subchapter or subchapter XVIII of this chapter based on the disability of any individual may be determined not to be entitled to such benefits on the basis of a finding that the physical or mental impairment on the basis of which such benefits are provided has ceased, does not exist, or is not disabling only if such finding is supported by–
>
> **(1)** substantial evidence which demonstrates that--
>
>> **(A)** there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and

> **(B)** the individual is now able to engage in substantial gainful activity; ...
>
> ***
>
> Any determination under this section shall be made on the basis of all the evidence available in the individual's case file, including new evidence concerning the individual's prior or current condition which is presented by the individual or secured by the Commissioner of Social Security. **Any determination made under this section shall be made on the basis of the weight of the evidence and on a neutral basis with regard to the individual's condition, without any initial inference as to the presence or absence of disability being drawn from the fact that the individual has previously been determined to be disabled.**

42 U.S.C. § 423(f) (emphasis added).

## DISCUSSION

Brockington assigns two errors in the Commissioner's decision: whether Brockington is entitled to a remand on the basis of new evidence, pursuant to sentence six of 42 U.S.C. §405(g), and whether the Commissioner's finding that his disability ceased on April 30, 1998, was supported by substantial evidence and legally correct. The Commissioner urges that substantial evidence supports her decision, and that Brockington did not properly present new and material evidence.

The record shows that the Appeals Council denied review, although it considered the new evidence Brockington submitted[14] and found the new evidence did not provide a basis for changing the ALJ's decision. The Court finds, based upon the whole record, that Mr. Brockington is not entitled to a remand of the case on the basis of new evidence pursuant to sentence six of 42 U.S.C. § 405(g). See, *Falge v. Apfel*, 150 F.3d 1320, 1323-24 (11th Cir.

---

[14]This consists of correspondence from Brockington's attorney along with assessments from Dr. Kergosien and Dr. Laseter which Brockington submitted in October 2002. Tr. 9, 11, 608-616.

1998); *Keeton v. Department of Health & Human Services*, 21 F.3d 1064, 1067 (11th Cir. 1994); *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993); *Eads v. Secretary of Department of Health and Human Services*, 983 F.2d 815, 817 (7th Cir. 1993).

Sentence six of 42 U.S.C. § 405(g) requires that evidence be "new" and "material" before a remand can be granted; in addition, a claimant must make a showing of "good cause" for failing to provide this evidence during the original proceedings. *Ripley v. Chater*, 67 F.3d 552, 555-56 (5th Cir. 1995). In order for new evidence to be material, (1) it must relate to the time period for which the disability benefits were denied, and (2) there must be a reasonable probability that the new evidence would change the administrative decision. *Id.* The ALJ asked both Dr. Kergosien and Dr. Laseter for all pertinent medical records (Tr. 556, 589). While the ALJ did not have the assessments of these doctors which were later submitted to the Appeals Council, the assessments appear to indicate the physicians consider Brockington to be somewhat more limited than is demonstrated by their contemporaneous office notes (or those of other treating sources) all of which were fully considered by the ALJ. As previously noted, the ALJ rejected Dr. Kergosien's opinion that Brockington was disabled as unsupported by the medical evidence presented. Tr. 29.

Brockington urges the ALJ failed to properly develop the record in a case involving an unrepresented claimant, asserting the ALJ should have sent him to his treating physicians for consultative examinations rather than to Dr. Crittenden and Dr. Matherne, and should have solicited more explicit assessments of his capacities. *Id.* The Court finds the record was adequately developed with findings from treating and examining physicians, as well as opinions from reviewing medical experts, and the ALJ did not breach any duty to develop it

15

further, under the requirements of *Kane v. Heckler*, 731 F.2d 1216, 1219-20 (5th Cir. 1984).

The Court is unpersuaded by Brockington's argument that, because the record does not clearly disclose why SSA sent him to the consultative examiners who were used here, agency rules were violated, necessitating a remand. The applicable regulations gave the Social Security Administration discretion as to the choice of examiners, despite the fact that treating sources were to be considered "preferred" providers. 20 C.F.R. §§ 404.1519g, 404.1519h, 404.1519i (1999). Moreover, no timely objections were voiced to the designated physicians, as required by 20 C.F.R. § 404.1519j (1999).

Finally, Brockington urges that the ALJ erred in finding he was capable of work in the national economy because he failed to include in his hypothetical question to the vocational expert all Brockington's functional limitations, specifically, he claims the ALJ failed to include limitations related to headaches and carpal tunnel syndrome. The record shows, however, that the ALJ did accept limitations on Brockington's ability to handle more than simple work tasks and to concentrate and attend, limitations that arose out of a combination of mental and physical problems, including his headaches. Tr. 532-533 Furthermore, although Brockington claims to have frequent headaches, in February 1999, Dr. Laseter described these as occurring only occasionally. Tr. 590 Brockington, himself, testified that he takes medications for his ailments, including headaches, which gives him moderate to complete relief. Tr. 83-84

With respect to Brockington's carpal tunnel condition, the record contains no medical evidence that this condition imposed significant functional limitations as of April 1998, when

his disability was found to have ended.  In March 1998, Dr. Crittenden found no sign of limitation of hand function,  and  Dr. Lew noted no complaints of hand or arm problems during multiple visits during the first part of 1998.  Tr. 480, 506-508.  Even in early 1999, Brockington did not mention such symptoms to Dr. Laseter.  Tr. 590

The Court finds the hypothetical questions  posed to the vocational expert adequately set forth Brockington's limitations, and the ALJ did not err in relying on the expert's testimony to find Brockington had regained the ability to perform substantial gainful activity by April 1998.

## CONCLUSION

After reviewing the record medical evidence of Brockington's medical treatment from February 1998 through October 1999, the Court finds that the ALJ's synopsis of that evidence, located at Tr. 26-29, is thorough and accurate, and his analysis of the evidence, fair. The ALJ found unsupported by the record Dr. Kergosien's conclusion that Brockington remains disabled, stating that such opinions  "cannot be given more weight than the combined treating notes from his own records and the records of the other treating sources."  Tr. 29. The ALJ gave no weight to Mr. Strickland's conclusion that Brockington "would suffer consequences if forced to work in an office environment" due to his psychiatric difficulties, because Strickland's own records noted no foundation for the opinion, and the mental records submitted in the case did not support such an opinion.

The Court finds the Commissioner's decision finding Brockington's disability terminated as of April 30, 1998, resulted from proper application of correct law to factual

findings. Moreover, the decision is supported by substantial evidence.

**IT IS THEREFORE ORDERED AND ADJUDGED** that Claimant's Motion for Reversal and Remand of the Secretary's Decision [19-1] should be and is hereby **DENIED.** A separate judgment will be entered herein in accordance with this Order as required by Rule 58 of the Federal Rules of Civil Procedure.

**SO ORDERED AND ADJUDGED** this the 22th day of March, 2006.

                                              s/ *Louis Guirola, Jr.*
                                              LOUIS GUIROLA, JR.
                                              UNITED STATES DISTRICT JUDGE